# STATE OF CONNECTICUT *v.* ROBERT WARD
## (AC 23159)

Schaller, Flynn and McLachlan, Js.

Argued March 23—officially released June 15, 2004

*G. Douglas Nash*, former public defender, and *Christopher Neary*, special deputy assistant public defender, with whom, on the brief, was *Jeremy Walker*, certified legal intern, for the appellant (defendant).

*Frederick W. Fawcett*, supervisory assistant state's attorney, with- whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *Margaret E. Kelley*, senior assistant state's attorney, for the appellee (state).

*Opinion*

FLYNN, J. The defendant, Robert Ward, appeals from the judgment of conviction, rendered after a jury trial, of

criminal possession of a firearm in violation of General Statutes § 53a-217, carrying a pistol without a permit in violation of General Statutes § 29-35, criminal trespass in the third degree in violation of General Statutes § 53a-109 and criminal mischief in the third degree in violation of General Statutes § 53a-117. The defendant also appeals from the judgment of conviction resulting from being found guilty of being a persistent serious felony offender by the trial court pursuant to General Statutes § 53a-40 (2) (c).

On appeal, the defendant claims that (1) the court improperly denied his motion to suppress evidence obtained as a result of an illegal *Terry* stop,[1] (2) the court improperly precluded the defendant from testifying about statements the police made during the stop, (3) his fifth amendment right to be free from double jeopardy was violated when he was convicted of both carrying a pistol without a permit and criminal possession of a firearm and (4) the evidence was insufficient to sustain his conviction of criminal trespass in the third degree. We disagree and affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The owner of an apartment building gave the Bridgeport police keys to the premises so that, as a part of their regular neighborhood police duties, they could patrol the hallways because of a number of break-ins, narcotics sales and rampant prostitution on the premises. After a walk-through of the building on December 26, 2000, Officer Adam Roscoe and Officer Martin Heaneu stationed themselves inside of the Washington Avenue entrance to the building.[2] The Washington Avenue entrance had a "No Trespassing" sign

---

[1] See *Terry* v. *Ohio*, 392 U.S. 1, 21–22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[2] Prior to entering the premises, the officers called Officer Jesse Pizarro, who was familiar with the building, to assist them in the walk-through.

posted outside it. The door to that entrance had been broken repeatedly by persons who did not possess keys to the building, although there was a main entrance to the building on Sanford Place with an intercom and buzzer system for tenants and visitors. The officers heard the door being forcibly yanked multiple times, and, finally, after the defendant forced it open, they watched him walk into the building. The officers stopped the defendant and asked him if he was a tenant. He responded in the negative. They then asked him what his business was in the building. He stated that he was there to visit "his boy," but would not divulge the person's real name.[3]

A third officer, Jesse Pizarro, arrived as backup, enabling Heaneu to go upstairs to knock on the door of the apartment the defendant named as the one he was visiting. No one answered the door when Heaneu knocked. While Heaneu was upstairs, Roscoe obtained identification from the defendant and checked to see if he had any outstanding warrants. During this time, the defendant put his hands in his pockets. Roscoe, apparently for his own safety, asked him to keep his hands in sight, and when the defendant complied by removing his hands, a straw became visible, sticking out of his pocket. When asked what the straw was for, the defendant stated that he used it to snort heroin. When he was asked if he had any drugs on him, the defendant disobeyed the officer's orders to keep his hands in sight, reached into his pocket and made a motion toward Roscoe's head. The two officers attempted to grab the defendant, but he managed to slip out of his jacket and flee the scene. The officers

[3] At trial, the defendant changed the version of the story that he had told the police and testified that the Sanford Place entrance's buzzer system was not working and that he was really at the building to visit a girl named Tasha. He also stated that the police set him up, that he was searched immediately upon his entry into the building and that he never had the gun or the straw on his person that the police claimed to have found.

gave chase, and the defendant was subsequently seized and put into a police car, which he proceeded to damage by kicking the interior.

In the meantime, Heaneu returned downstairs to find that Roscoe, Pizarro and the defendant were gone, but that the defendant's jacket had been left on the floor. Roscoe returned to the building and met Heaneu in the hallway. They brought the jacket outside and set it on the ground. On impact with the ground, a loaded gun hidden in the lining of the defendant's jacket discharged and shot off a part of Heaneu's finger. The defendant now appeals after being tried, convicted and sentenced. Further facts will be provided where pertinent.

I

The defendant first claims that the court improperly denied his motion to suppress because the police illegally detained him in an alleged investigative or *Terry* stop, and therefore, all evidence obtained as a result of that stop should have been suppressed. We disagree.

Our review standard for allegedly unlawful *Terry* stops is settled. "When considering the validity of a *Terry* stop, our threshold inquiry is twofold. . . . First, we must determine at what point, if any, did the encounter between [the police officer] and the defendant constitute an investigatory stop or seizure. . . . Next, [i]f we conclude that there was such a seizure, we must then determine whether [the police officer] possessed a reasonable and articulable suspicion at the time the seizure occurred. . . .

"We must first determine, therefore, at what point, if at all, a seizure occurred. [Our Supreme Court has] . . . defined a person as seized under our state constitution when by means of physical force or a show of authority, his freedom of movement is restrained. . . . In determining the threshold question of whether there

has been a seizure, we examine the effect of the police conduct at the time of the alleged seizure, applying an objective standard. Under our state constitution, a person is seized only if in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. . . . Therefore, [w]hether there has been a seizure in an individual case is a question of fact." (Citations omitted; internal quotation marks omitted.) *State* v. *Santos,* 267 Conn. 495, 503–504, 838 A.2d 981 (2004).

If a seizure has occurred, we then turn to an analysis of "whether the trial court properly concluded that the seizure was based on a reasonable and articulable suspicion of criminal activity. The determination of whether a reasonable and articulable suspicion exists rests on a two part analysis: (1) whether the underlying factual findings of the trial court are clearly erroneous; and (2) whether the conclusion that those facts gave rise to such a suspicion is legally correct." (Internal quotation marks omitted.) Id., 504–505.

"Under the fourth amendment to the United States constitution and article first, [§ 7] . . . of our state constitution, a police officer is permitted in appropriate circumstances and in an appropriate manner to detain an individual for investigative purposes if the officer believes, based on a reasonable and articulable suspicion that the individual is engaged in criminal activity, even if there is no probable cause to make an arrest." (Internal quotation marks omitted.) *State* v. *Gaston,* 82 Conn. App. 161, 165, 842 A.2d 1171 (2004); see also *Terry* v. *Ohio,* 392 U.S. 1, 21–22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

"[I]n justifying [a] particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. . . . *Terry* v. *Ohio,* supra, 392 U.S. 21 . . . . In

determining whether a detention is justified in a given case, a court must consider if, relying on the whole picture, the detaining officers had a particularized and objective basis for suspecting the particular person stopped of criminal activity." (Citations omitted; internal quotation marks omitted.) *State* v. *Santos*, supra, 267 Conn. 505; see also *Illinois* v. *Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000).

In denying the defendant's motion to suppress, the court made the following statements and noted the following facts, only some of which are challenged by the defendant. We analyze the findings made and the defendant's claims as they arise.

The court stated: "The landlord testified that the apartment house that was his was a place where there's a tremendous amount of drug activity going on." The defendant does not claim this was an erroneous finding, but argues that "the assertion of generalized drug activity in the area was of no moment." We disagree. The defendant is correct that his mere presence in a building in a high crime neighborhood, in itself, would be insufficient to uphold a reasonable and articulable suspicion and would be considered "profiling"; see *State* v. *Donahue*, 251 Conn. 636, 648, 742 A.2d 775 (1999), cert. denied, 531 U.S. 924, 121 S. Ct. 299, 148 L. Ed. 2d 240 (2000); *State* v. *Oquendo*, 223 Conn. 635, 655, 613 A.2d 1300 (1992); see also *Brown* v. *Texas*, 443 U.S. 47, 52, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979); however, the fact that it was probable that drug dealers and others were using this particular entrance to trespass on the property was just one factor that the officers took into consideration when analyzing the defendant's purpose on the property. Although presence in a high crime area alone cannot constitute a reasonable suspicion, an officer is not required to ignore the circumstances and area around the observed suspect. See *United States* v. *Moore*, 235 F.3d 700, 704 (1st Cir. 2000); see

also *Illinois* v. *Wardlow*, supra, 528 U.S. 124 ("officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation"). The defendant's mode of entrance into the premises could lead an ordinary person to believe that the defendant was not a tenant and probably not a visitor. We conclude that the character of the neighborhood was *not* irrelevant. We further conclude that neighborhood character was not the primary basis for the *Terry* stop.

The court also noted that the landlord "testified further that he had contacted the police hundreds of times, as often as . . . multiple times per day. The problem he indicated was so bad that he gave the police keys to get them in and . . . by the officers' testimony, they would be there often, almost daily, and they had made numerous arrests. One of the officers testified that there was drug consumption on all of the floors. All the tenants had the key they could use on any of the doors. The same key worked on any of the four doors." The defendant does not challenge these findings, or the court's findings that "[t]he defendant came in the side door on Washington Avenue by banging it several times trying to enter . . . which he eventually opened. A tenant would not need to do that. He or she would have a key. There were signs. Testimony indicat[ed] that there were signs indicating there was no trespassing, no loitering and so on."

We next review the defendant's claim that the court's finding as to the mode of entry for visitors was clearly erroneous. The court found that "[a]ll visitors got buzzed in through the intercom at the main entrance at 25 Sanford [Place]." The defendant argues that "[t]o the extent this meant that anyone not entering through the Sanford Place door was not a visitor, it is erroneous." We are not persuaded. The court was free to

believe the landlord's testimony that visitors only may enter the building through an intercom buzzer system at the Sanford Place entrance. Additionally, from the landlord's testimony that all doors were locked and all tenants had keys to all doors, the court was free to infer that a key was needed to open the locked Washington Avenue door without force. We therefore conclude that these findings were not clearly erroneous.

"[W]here [a defendant] trespasses in a building or on premises manifestly meant to exclude outsiders, the owner's interest in the privacy of his own property justifies criminal penalties." Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. § 53a-109 (West 2001), commission comment, p. 212. The rationale underlying the crime of criminal trespass is "to protect one's property from unwanted intruders." Id., § 53a-110, commission comment. Although the defendant is correct that the posting of "No Trespassing" signs outside the Washington Avenue entrance did not specifically deny entrance to visitors or other legitimate licensees, the facts that a key was needed to open the door without force and that the door did not contain a buzzer entry system did deny visitor's entrance. Additionally, tenants had keys to all four of the building doors. The defendant forcibly entered a building in which many drug arrests had been made, and which is located in a neighborhood known for its drug activity. The landlord had identified the building as having a high number of trespassers entering through this specific entrance. It was a reasonable inference that the defendant did not have a key and probably was not a visitor or a resident because he had to yank on the door multiple times to open it.

The defendant next challenges the court's finding "based on the evidence and the reasonable inferences that can be drawn from that evidence, that the police stopped the defendant on a reasonable and articulable

suspicion of criminal trespass in the third degree. This investigatory stop was then fortified by the defendant saying he was not a tenant . . . and when asked to identify the person he was visiting [he] did not give a name but only identified that person as 'boy.' " The defendant claims that he was seized a few moments after he entered the building, before questioning began, and that the police lacked a reasonable and articulable suspicion to stop him. We disagree.

The *Terry* stop did not occur immediately after the defendant entered the hallway. "Courts have made clear that police officers do not bring about a 'seizure' merely by asking questions of a citizen, even when the officer identifies himself as a police officer." (Internal quotation marks omitted.) *State* v. *Kidd*, 59 Conn. App. 598, 602, 757 A.2d 1168 (2000), cert. denied, 255 Conn. 932, 767 A.2d 106 (2001). The officers merely questioned the defendant when he first opened the door. At that point, a seizure had not occurred. Our Supreme Court has determined that a seizure occurs when a reasonable person would believe that the defendant was not free to leave because his freedom of movement was restrained by means of physical force or a show of authority. *State* v. *Santos*, supra, 267 Conn. 503–504. The defendant was free to leave until the moment that the officers questioned the defendant and learned that he was not a tenant and could not or would not name the person he claimed to be visiting. It was at this time that a *Terry* stop occurred. The officers then obtained identification from the defendant to check for any outstanding warrants, had an officer arrive as backup and sent another officer upstairs to investigate the defendant's story about his purpose in the building.

At the time the *Terry* stop occurred, the police had a reasonable and articulable suspicion that the defendant was committing criminal trespass. We first examine the elements of that statute. Section 53a-109 (a) provides

in relevant part: "A person is guilty of criminal trespass in the third degree when, knowing that he is not licensed or privileged to do so: (1) He enters or remains in premises which are posted in a manner prescribed by law or reasonably likely to come to the attention of intruders . . . ." Under this fact pattern, the elements of the crime include that the defendant (1) entered or remained in the premises that were posted in a manner prescribed by law or reasonably likely to come to the attention of intruders and (2) knew he was not licensed or privileged to so enter or remain. See A. Ment & R. Fracasse, Connecticut Selected Jury Instructions: Criminal (3d Ed. 1995) § 9.45. We conclude that given the facts and circumstances of this case, the officers' suspicion was reasonable and articulable as to each element of criminal trespass in the third degree.

The officers knew before the defendant entered the building that the premises were posted in a manner prescribed by law or reasonably likely to come to the attention of intruders. The Washington Avenue entrance was clearly marked with a "No Trespassing" sign. In addition, a key was needed to open the door without force, and the entrance lacked a buzzer entry system such as the one at the Sanford Place entrance. These facts support a reasonable inference that the door to the Washington Avenue entrance was not an authorized entrance for visitors.

The defendant does not contest that he entered the building. The officers observed the defendant's entrance. The defendant forcibly had to yank on the door multiple times before he gained access. Once he entered the building, the defendant could have turned around and walked out. Instead, the defendant stayed and answered the officers' questions.

The *Terry* stop was not conducted solely on the basis of the defendant's entry through the posted door. Other

facts added to the officers' suspicions that a trespass was occurring and fulfilled the requirement that the defendant knew he was not licensed or privileged to enter the premises, but proceeded to do so. The inference that the defendant did not possess a key to the building because he had to yank on the door to force it open and his statement that he was not a tenant and could or would not name the person he was visiting added to the officers' suspicions. Therefore, we conclude that the officers had a reasonable and articulable suspicion as to each element of the crime of trespass in the third degree on which they could stop the defendant in order to investigate his claim of license to enter the premises.

"The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." (Internal quotation marks omitted.) *State* v. *Carcare*, 75 Conn. App. 756, 768, 818 A.2d 53 (2003).

The officers already had called for backup. They asked the defendant for identification and sent an officer to the apartment, the number of which the defendant supplied, to see if his story checked out. "One function of a constitutionally permissible *Terry* stop is to maintain the status quo for a brief period of time to enable the police to investigate a suspected crime. A police officer who has proper grounds for stopping a suspect has constitutional permission to immobilize the suspect briefly in order to check a description or an

identification, so long as his conduct is strictly tied to and justified by the circumstances which rendered its initiation permissible. . . . Determination of the means that are reasonably necessary to maintain the status quo necessarily depends on a fact-bound examination of the particular circumstances of the particular governmental intrusion on the personal security of a suspect." (Internal quotation marks omitted.) Id. The facts of this case lead us to conclude that the officers had a reasonable and articulable suspicion as a basis for the initial stop of the defendant.

In addition to his argument regarding the initial stop, the defendant contends that the stop was illegal because the defendant was detained for too long of a time. "In assessing whether a detention is too long in duration to be justified as investigative, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was only to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." (Internal quotation marks omitted.) *State* v. *Bowden*, 15 Conn. App. 539, 546, 545 A.2d 591, cert. denied, 209 Conn. 810, 548 A.2d 438 (1988). We find nothing in this record to persuade us that the duration of this stop was illegal. The defendant's method of gaining entrance to the building and his refusal to state the name of the person whom he was visiting made the officers suspicious that the defendant was trespassing. The defendant's detention was further prolonged by his conduct in exposing a straw he admitted was used for heroin snorting, his movement that the police objectively could have regarded as menacing to them and finally, his running when the officers attempted physically to restrain him, leaving behind the jacket with the concealed loaded gun, which subsequently fired and maimed one of the officers.

Upon the defendant's forcible entrance into the building through a locked door, the police had reason to ask

the defendant what the nature of his business in the building was. When he was unable to name the person whom he was visiting, it was proper for the officers to detain the defendant briefly while conducting an investigation to maintain the status quo. Under those circumstances, the court properly concluded that the police had a reasonable and articulable suspicion before stopping the defendant and that they acted in accordance with the principles of a constitutionally permissible *Terry* stop. Therefore, the court properly denied the defendant's motion to suppress evidence of the gun, the stop and all subsequent events.

## II

The defendant next claims that the court improperly precluded him from testifying about the statements the police made during the *Terry* stop because the statements were essential to his defense that the police officers had a motive and a plan to accuse him falsely of possessing the pistol. The defendant also contends that the statements were admissible as inconsistent statements.

There are three statements that the court precluded the defendant during direct examination from attributing to the police officers. The defendant wanted to testify (1) that Roscoe said, "look what we have here," (2) that Heaneu stated, "look at this piece of shit garbage" when referring to the pistol, and (3) that Roscoe asked the defendant, "you like to carry guns, don't you?" As to the latter two statements, after the state's hearsay objection was sustained, the defendant did not take exception to the ruling. When the defendant was asked if he wanted to make an objection on the record, defendant's counsel stated that he would not claim an objection. "A party is not entitled to have a claim reviewed on appeal on grounds different from those presented at trial. . . . To hold otherwise would result in trial

judges' being found to have erred on questions never fairly presented to them." (Internal quotation marks omitted.) *State* v. *James*, 54 Conn. App. 26, 36, 734 A.2d 1012, cert. denied, 251 Conn. 903, 738 A.2d 1092 (1999). Therefore, we will not review the defendant's evidentiary claims as to the second and third statements.

The first statement at issue allegedly made by the police was, "look what we have here." We agree with the state that the defendant did not properly preserve his objection to this statement on the ground he now urges on appeal, namely, that the statement was evidence of motive or bias. Therefore, we will not review this portion of the defendant's claim. We also are unpersuaded by the argument that the statement was admissible as an inconsistent statement because we conclude that the defendant did not lay the proper foundation to introduce the hearsay. Even if we were to determine that the three statements were excluded improperly, the defendant was not harmed because he was not precluded from confronting the declarants with their alleged statements and was able to introduce his defense through other evidence.[4]

The state objected to the statement, "look what we have here," as inadmissible hearsay. "An out-of-court statement offered to establish the truth of the matter asserted is hearsay. . . . As a general rule, such hearsay statements are inadmissible unless they fall within a recognized exception to the hearsay rule." (Citation omitted.) *State* v. *Merriam*, 264 Conn. 617, 633, 835 A.2d 895 (2003). The defendant's counsel made a shifting argument regarding the propriety of the statement's admission into evidence. Although the defendant argued that the statement was not hearsay, he also

---

[4] Because we have concluded that the defendant was not deprived of his right to present a defense or to confront witnesses, the defendant's claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), must also fail. Therefore, an analysis of this claim is not warranted.

seemed to believe, incorrectly, that because he did not object to the hearsay statements made in the testimony of the police officers, the court would have to allow him the same latitude. When the court asked him the reason or relevancy of the statement if it was not being offered for the truth of the matter asserted, defense counsel stated that it was admissible as an inconsistent statement made by a declarant. The court sustained the objection because an adequate foundation had not been laid for an inconsistent statement. Although he now argues on appeal that the evidence was admissible to show motive or bias of the police against him, this argument was not made at trial. Therefore, because the defendant did not properly preserve for appeal his claim that the statement was not being offered for the truth of the matter asserted but to show motive or bias, we need not further analyze this claim.

The defendant did preserve his objection that this statement was an inconsistent statement made by a declarant. We agree with the state that a proper foundation was not laid and the court properly sustained the state's objection. "We review evidentiary claims pursuant to an abuse of discretion standard. Generally, [t]rial courts have wide discretion with regard to evidentiary issues and their rulings will be reversed only if there has been an abuse of discretion or a manifest injustice appears to have occurred. . . . Every reasonable presumption will be made in favor of upholding the trial court's ruling, and it will be overturned only for a manifest abuse of discretion." (Internal quotation marks omitted.) *Stanley* v. *Lincoln*, 75 Conn. App. 781, 785, 818 A.2d 783 (2003).

Section 6-10 (c) of the Connecticut Code of Evidence provides in relevant part: "If a prior inconsistent statement made by a witness is shown to or if the contents of the statement are disclosed to the witness at the time the witness testifies, and if the witness admits to

making the statement extrinsic evidence of the statement is inadmissible, except in the discretion of the court." "Where a party seeks to impeach a witness by using extrinsic evidence, certain standards must be met. The inconsistent statement must be relevant and of such a kind as would affect the witness' credibility, and, generally, a foundation for introducing the statement should be laid at the time of cross-examination of the witness. *State* v. *Saia*, [172 Conn. 37, 46, 372 A.2d 144 (1976)] . . . . In this state, we have no inflexible rule regarding the necessity of calling the attention of a witness on cross-examination to his alleged prior inconsistent statements before either questioning him on the subject or introducing extrinsic evidence tending to impeach him. From early times, it has consistently been held that it rests within the judicial discretion of the trial court whether to admit the impeaching statements where no foundation has been laid. . . . The trial court is vested with a liberal discretion as to how the inquiry should be conducted in any given case." (Citation omitted; internal quotation marks omitted.) *State* v. *Butler*, 207 Conn. 619, 626, 543 A.2d 270 (1988).

However, "[u]sually, the foundation for introducing a prior inconsistent statement is laid by asking the witness on cross-examination whether he made the statement and alerting him to the time and place at which it was made. . . . Where the witness denies having made the statement or is unable to recall having done so, extrinsic evidence may be admitted to show it was made." (Citations omitted.) Id.; see also C. Tait, Connecticut Evidence (3d Ed. 2001) § 6.35.5, p. 486.

The defendant contends that the statement, "look what we have here," would "show that Officer Roscoe knew the defendant from prior occasions." In order for this to have been an inconsistent statement, Roscoe would have had to have stated that he had not pre-

viously known the defendant.[5] A review of the record shows no such statement. Roscoe was never asked if he knew the defendant. The only question he was asked was whether "prior to that evening, had you seen the defendant *in the building*?" (Emphasis added.) The officer replied in the negative. The officer was never asked if he knew the defendant or had prior encounters with him. A statement cannot be inconsistent unless and until it contradicts something the declarant previously has said. In addition, the officer testified that he stopped the defendant after he entered the building. He did not testify as to whether he said anything upon stopping the defendant. The statement that the defendant wanted to testify to was not inconsistent with anything the officer stated at trial. Therefore, the court did not abuse its discretion in precluding the statement because the declarant was never confronted with the statement and never denied making it.

Even if we were to determine that these three challenged statements should have been allowed, their preclusion was harmless error under the circumstances of this case. The defendant was not denied his right to present a defense or to confront witnesses. The court did not preclude the introduction of Roscoe's statement. It did require that as a witness he be confronted with his statements before the defendant was allowed to testify to them. In addition, the defendant testified about his theory that he was set up by the police. He told the jury that Roscoe knew him, that he was searched immediately upon entry into the building, that he believed the police planted the gun on him and that he never had a straw in his pocket. His defense was placed

---

[5] The defendant also argues that the statement would give meaning and significance to the actions being taken by the police, illustrate the officer's state of mind and show the effect on the hearer. These reasons do not further his argument that this statement is an inconsistent statement made by Roscoe, and they need not be addressed by this court.

before the jury. Roscoe's alleged statement could have been admitted if a proper foundation had been laid. Because the record lacks such a foundation, the statement was properly excluded. Therefore, there was no violation of the defendant's right to confront witnesses or to present a defense.

## III

The defendant also claims that his conviction of carrying a pistol without a permit pursuant to § 29-35 (a) and criminal possession of a firearm pursuant to § 53a-217 (a) (1) constitutes multiple convictions for the same act and thus violates his federal and state constitutional right to be free from double jeopardy. See U.S. Const., amends. X, XIV; Conn. Const., art. I, § 8. The defendant notes that this court previously has decided that conviction of these offenses does not violate the proscription against double jeopardy and asks this court to reconsider the matter because those decisions were decided wrongly. See *State* v. *Laws*, 37 Conn. App. 276, 290, 295, 655 A.2d 1131, cert. denied, 234 Conn. 907, 659 A.2d 1210 (1995); *State* v. *Ortiz*, 15 Conn. App. 749, 751, 546 A.2d 338, cert. denied, 209 Conn. 820, 551 A.2d 757 (1988); *State* v. *King*, 15 Conn. App. 330, 332, 544 A.2d 261 (1988). We are constrained by these precedents and decline to overturn them. Therefore, we conclude that the defendant's right to be free from double jeopardy was not violated.

## IV

The defendant's last claim is that the evidence was insufficient to sustain his conviction of criminal trespass in the third degree in violation of § 53a-109 (a) (1). The state had to prove beyond a reasonable doubt that the defendant (1) entered or remained in the premises that were posted in a manner prescribed by law or reasonably likely to come to the attention of intruders and (2) knew he was not licensed or privileged to so

enter or remain. See General Statutes § 53a-109 (a) (1); see also A. Ment & R. Fracasse, supra, § 9.45. The defendant argues that the state failed to prove both that he was not licensed or privileged to enter or to remain in the building and that the premises were posted in a manner prescribed by law or reasonably likely to come to the attention of intruders. We disagree.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"While . . . every element [must be] proven beyond a reasonable doubt in order to find the defendant guilty of the charged [offense], each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . [I]n determining whether the evidence supports a particular inference, we ask whether that inference is so unreasonable as to be unjustifiable. . . . [A]n inference need not be compelled by the evidence; rather, the evidence need only be reasonably susceptible of such an inference." (Citation omitted; internal quotation marks omitted.) *State* v. *Moore*, 82 Conn. App. 267, 270, 843 A.2d 652, cert. denied, 269 Conn. 904, 852 A.2d 734 (2004).

From the evidence presented at trial, read in the light most favorable to sustaining the verdict, the jury reasonably could have found that the entranceway was properly posted and that the defendant entered and remained in the premises knowing that he did not have a right to be in the building. The defendant does not

contest that he entered and remained in the building. The officers observed his entrance and the defendant admitted to being in the building. The jury also could have found that the defendant had knowledge that he did not have a right to enter the building. He entered the building by forcing open a locked door by yanking it multiple times. He chose not to use the main entrance that he knew had a buzzer system for the admittance of visitors.[6] The defendant argues that many individuals, not just tenants, used this door for entrance into the building. The mere fact that others had forced the lock on the door to gain admittance does not render this entranceway a public or semipublic entrance that visitors were permitted to use. The jury was entitled to infer and to find that there was a lock and lack of a buzzer system on this door for a reason; it was to be used only by persons possessing keys. The defendant also told the police and the jury conflicting stories about the individual he was supposedly visiting. He testified that the person he was going to see knew he was coming; yet, when the police knocked on the apartment door, no one answered. A jury reasonably could have found that the defendant knew he had entered the building without permission.[7]

In addition, a jury reasonably could have found that the premises were posted in a manner prescribed by law or reasonably likely to come to the attention of

[6] The defendant testified that the buzzer system was not functioning. Without evidence that this was true, the jury was under no obligation to believe the testimony of the defendant. See *State* v. *Robinson*, 81 Conn. App. 26, 33, 838 A.2d 243, cert. denied, 268 Conn. 921, 846 A.2d 882 (2004).

[7] The defendant chose not to present the affirmative defense embodied in General Statutes § 53a-110. This statute relieves a defendant of criminal liability if he believes that he is authorized or can prove that an authorized person would have given him permission to enter or remain at the premises. See General Statutes § 53a-110. "[The statute's] purpose is to relieve from criminal liability one who is, in a sense, an innocent intruder." Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. § 53a-110 (West 2001), commission comment, p. 213.

intruders. The entrance had a "No Trespassing" sign clearly displayed outside of the building doorway that he entered. The defendant had to force his way through a locked door. He also knew that there was a main entranceway with a buzzer system, something the doorway he used did not contain. A jury clearly could have concluded that the defendant was not licensed or privileged to enter and knew of this upon entering the building. Therefore, we conclude that there was sufficient evidence before the jury for it to determine that the defendant was guilty of criminal trespass in the third degree.

The judgment is affirmed.

In this opinion the other judges concurred.