STATE OF CONNECTICUT *v.* JARRELL RICHARDS
(AC 28567)

Harper, Beach and Berdon, Js.

Argued October 28, 2008—officially released April 21, 2009

*Mary Beattie Schairer*, special public defender, for the appellant (defendant).

*Laurie N. Feldman*, special deputy assistant state's attorney, with whom, on the brief, were *Jonathan C.*

*Benedict*, state's attorney, and *Charles M. Stango*, assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Jarrell Richards, appeals from the judgment of conviction following his conditional plea of nolo contendere[1] to possession of a weapon in a motor vehicle in violation of General Statutes § 29-38. The plea followed the trial court's denial of the defendant's motion to suppress evidence that the police seized from an automobile that the defendant was driving prior to an investigatory detention by the police of the automobile and its occupants. The defendant argues that the court's denial of the motion to suppress was improper because the investigatory detention was not constitutionally permissible and the evidence seized from the automobile was the fruit of this police activity. We affirm the judgment of the trial court.

The record reveals the following facts and procedural history. In February, 2006, the defendant was arrested and charged with possession of a weapon in a motor vehicle, possession of narcotics and using a motor vehicle without the owner's permission. In July, 2006, the defendant filed a motion to suppress all evidence that the police seized from the automobile that he was driving prior to his arrest. The defendant argued that the search of the automobile violated his rights against unlawful search and seizure afforded by the federal

---

[1] General Statutes § 54-94a provides: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress or motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law provided a trial court has determined that a ruling on such motion to suppress or motion to dismiss would be dispositive of the case. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. A plea of nolo contendere by a defendant under this section shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution."

and state constitutions. On October 2, 2006, the court, *Ginocchio, J.*, held an evidentiary hearing on the motion to suppress. At the conclusion of the hearing, the court announced its ruling denying the motion. On October 3, 2006, the defendant entered a plea of nolo contendere to the charge of possession of a weapon in a motor vehicle, conditioned on his right to appeal from the court's denial of his motion to suppress.[2] The court, *Carroll, J.*, accepted the plea and, on January 2, 2007, sentenced the defendant to a five year term of incarceration, suspended after nine months, followed by a three year period of probation. This appeal followed.

At the hearing on the motion to suppress, the state presented testimony from Orlando Rosado, David Riehl and Carl Bergquist, three of the Bridgeport police officers who took part in the defendant's apprehension and arrest. Viewed in its entirety, the testimony of these officers described the following version of events. At times relevant, Rosado and Riehl were members of the narcotics and vice tactical narcotics team, having received specialized training in such matters as surveillance of drug related activities. As members of this team, the officers gathered information from a variety of sources and targeted the activities of suspected drug dealers. During the early morning hours of February 22, 2006, the officers conducted surveillance in the area of Washington, Highland and Sanford Avenues. On the basis of information provided to the police, as well as their experience in the area, the police knew this residential area to be a place where drug related activities occurred. The officers recalled that at that time, the police recently had made both drug and prostitution arrests in the area.

---

[2] Pursuant to a plea agreement, the state entered a nolle prosequi with regard to the two other crimes with which the defendant stood charged. The court subsequently determined that its ruling on the motion to suppress was dispositive of the case. See General Statutes § 54-94a, set forth in footnote 1.

At approximately 1:30 a.m., the officers observed an automobile, being operated by the defendant, stop along Sanford Avenue. The automobile displayed Vermont license plates, a fact that raised the officers' awareness because it was unusual to observe visitors from Vermont in that area, out-of-state plates are commonly found on rented automobiles and drug dealers commonly use rented automobiles in their drug related activities in an attempt to escape police detection.

For several minutes, the officers observed the defendant and two passengers merely sitting in the automobile. By virtue of their training and experience, the officers were aware that this seemingly innocuous behavior was consistent with drug related activity. That is, the officers were aware that drug dealers and buyers often park their automobiles along the street in this manner while waiting for others to approach, either on foot or in other automobiles, to transact drug related business. The fact that this conduct was occurring at that early morning hour, on a February weeknight and in an area where drug related activity was prevalent, reinforced these suspicions of criminal activity.

After a few minutes, the officers observed a female pedestrian walking along the street approach the passenger side of the automobile[3] and briefly converse with one or more of the automobile's occupants before continuing on her way. The officers did not observe any hand-to-hand transaction take place. Thereafter, the defendant drove off, and the officers approached and spoke to the pedestrian. The officers asked her what had transpired, to which she replied that the occupants of the automobile had asked her to approach them and asked her if she "was straight." The officers and the pedestrian clearly understood this slang expression to be a way of asking whether she wanted to buy

---

[3] One of the officers observed someone in the automobile motion to the pedestrian, inviting her to approach the automobile.

drugs. The officers did not recognize the pedestrian, did not detain her and did not obtain any personal information from her because she did not want to provide such information. In light of their experience with other members of the public in analogous situations, the officers judged the pedestrian to be cooperative and forthcoming with regard to the information that she did provide. The officers also deemed her version of what had occurred during her brief encounter with the occupants of the automobile to be consistent with what they had observed. The officers' observations of the encounter and their conversation with the pedestrian elevated their suspicion that one or more occupants of the automobile was engaged in the unlawful sale of drugs.

Following their conversation with the pedestrian, Rosado and Riehl contacted Bergquist, a police sergeant who, along with another officer, was on patrol in the area. Rosado and Riehl relayed a description of the automobile and its occupants and asked Bergquist to stop the automobile. Bergquist located the automobile as it was traveling nearby. He activated his vehicle's police lights and stopped the automobile. Before exiting his police cruiser, Bergquist observed the occupants of the automobile move around, turn their heads and duck. This movement elevated Bergquist's suspicion, on the basis of his training and experience, that the occupants were engaged in some type of illegal activity and that they could be secreting contraband within their automobile. The officer who was on patrol with Bergquist that night removed the front passenger from the automobile. This passenger was behaving in an "extremely suspicious" manner in that he had been twisting and turning in the automobile and could be seen moving his hands. Upon his removal from the automobile, the passenger was behaving in a manner that suggested to Bergquist that he might attempt to flee the scene. After the front

passenger was placed in handcuffs, the officers removed the defendant and the backseat passenger from the automobile and patted them down for weapons.

At this point, Bergquist began to search the passenger compartment of the automobile. Bergquist located a smaller compartment, behind a child's car seat, in the backseat area of the automobile. In this smaller compartment, Bergquist discovered a loaded .25 caliber Beretta handgun. The police later found inside the automobile a substance that they believed to be crack cocaine.

At the close of the evidentiary hearing on the motion to suppress, the court, in an oral ruling, set forth its findings and conclusions. The court stated: "[T]he police testified that they had a whole source of tips and information that leads them to set up an investigation for drugs; they determined this was a high crime area. The court makes a finding based on the testimony by these credible witnesses that it was a high crime area. It's now 1:30 in the morning, very late at night, and you have a car in the vicinity of the area in question, which has Vermont plates. The officers found that to be suspicious. The court, based on the testimony, finds that to be one of the suspicions that would make up the totality of the circumstances in this case, which would give rise to a further investigation. They see an unknown pedestrian female coming down the road; she approaches the vehicle. The court finds that testimony credible. A conversation ensues with the three males in the car at 1:30 in the morning on a Thursday night. . . .

"At 1:30 in the morning, this female has a conversation with these gentlemen in the car, and the officers approach the female shortly thereafter and they have a conversation with her. And the female indicates that the question they ask this female is, is she straight. The

testimony was that she understood the question, and it was her belief that . . . they were going to sell her drugs. The court finds that testimony to be credible and that in conjunction with the other facts, [it] would heighten their suspicion, certainly, and I think it would give them the right at that point to at least do an investigatory stop of the automobile in question.

"They radio Officer Bergquist, and he stops the vehicle. As he's approaching the vehicle . . . the passengers appear to be nervous, they're ducking, there's head turning, and this is the movement of the people in the car. And the court will make a finding that [this conduct] certainly constitutes furtive movement. The testimony of the officer was that this movement was consistent with weapons and narcotics, and that would give the officers, based on the totality of [the] circumstances, every right to continue to investigate the people in the car and at least pull them out of the car, pat them down, and search . . . the passengers for weapons and then the vehicle for weapons.

"And in this case, once the officer did search the vehicle, he located behind the car seat an automatic weapon, which would then be an indication that a criminal act was being committed by the . . . possession of this weapon, which would give rise to a more in-depth search. So, based on those findings and the totality of the circumstances, [the] motion to suppress is denied."

On appeal, there appears to be no dispute concerning the questions of if and when an investigatory detention occurred. The court determined that an investigative detention was warranted after Rosado and Riehl spoke with the pedestrian and that Bergquist thereafter stopped the defendant's automobile. Our review of the arguments that were advanced by the parties, both at the suppression hearing and before this court, reveals

that the parties agree with the court that an investigatory detention occurred when the defendant stopped the automobile he was driving. This occurred after the defendant observed Bergquist, in his police cruiser, follow his automobile.[4] The issue presented is whether an investigative detention was constitutionally permissible at that time.[5]

The defendant does not challenge the court's findings of fact. The defendant claims that the police detention of the automobile and its occupants violated his constitutional rights because the police lacked a reasonable and articulable suspicion that criminal activity was afoot. The defendant argues that the search of the automobile and subsequent discovery and seizure of the gun was the fruit of this police illegality. Accordingly, the defendant argues that the court improperly denied his motion to suppress the evidence discovered during the search.

[4] "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement . . . through means intentionally applied . . . . Thus, an unintended person . . . [may be] the object of the detention, so long as the detention is willful and not merely the consequence of an unknowing act. . . . A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise there is at most an attempted seizure, so far as the Fourth Amendment is concerned." (Citations omitted; internal quotation marks omitted.) *Brendlin* v. *California*, 551 U.S. 249, 254, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007).

The evidence reflects that Bergquist, upon receiving a radio transmission from his fellow officers, Rosado and Riehl, located the defendant's automobile while it was traveling on a city street. At a late hour, Bergquist activated his vehicle's police lights and approached the defendant's automobile from behind. The defendant responded by stopping his automobile. In light of this show of authority by the police, as well as the defendant's conduct in response to such show of authority, we conclude that a finding that a seizure occurred at that time is both supported by fact and reasonable.

[5] Apart from claiming that the investigative detention was improper, the defendant does not challenge the legality of the search by the police of the automobile.

"[O]ur standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the court's [ruling] . . . . Because a trial court's determination of the validity of a . . . search [or seizure] implicates a defendant's constitutional rights . . . we engage in a careful examination of the record to ensure that the court's decision was supported by substantial evidence. . . . However, [w]e [will] give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Citation omitted; internal quotation marks omitted.) *State* v. *Kimble*, 106 Conn. App. 572, 579, 942 A.2d 527, cert. denied, 287 Conn. 912, 950 A.2d 1289 (2008).

The defendant challenges the constitutionality of the investigative detention under the state and federal constitutions; our review of the claim is limited to the federal constitution.[6] "Under the fourth amendment to

---

[6] In his principal appellate brief, the defendant, citing provisions of the federal and state constitutions, claimed that the investigatory detention was unconstitutional. The defendant cited *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), and listed the six considerations set forth in *Geisler* for construing the provisions of our state constitution. The defendant, however, failed to discuss these considerations and, in fact, did not conclude that our state constitution provides any greater protection than its federal counterpart with regard to the specific claim presented in this appeal.

During oral argument before this court, the defendant's attorney, in response to an inquiry as to whether the defendant was arguing that his claim should be analyzed differently under the state constitution, acknowledged that under both constitutions the relevant legal principles were the same. The defendant's attorney, however, did not indicate that the defendant was withdrawing the state constitutional claim.

The constitutional principles that govern the defendant's claim are the same under both the state and federal constitutions. Nevertheless, we note

the United States constitution and article first, §§ 7 and 9, of our state constitution, a police officer is permitted in appropriate circumstances and in an appropriate manner to detain an individual for investigative purposes if the officer believes, based on a reasonable and articulable suspicion that the individual is engaged in criminal activity, even if there is no probable cause to make an arrest. . . . Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. . . .

"[I]n justifying [a] particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. . . . In determining whether a detention is justified in a given case, a court must consider if, relying on the whole picture, the detaining officers had a particularized and objective basis for suspecting the particular person stopped of criminal activity. When reviewing the legality of a stop, a court must examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom. . . . A recognized function of a constitutionally permissible stop is to maintain the status quo for a brief period of time to enable the police to investigate a suspected crime. . . .

"[E]ffective crime prevention and detection . . . [underlie] the recognition that a police officer may in

that because the defendant has not provided this court with a separate and distinct analysis of his claim under the state constitution, we address only his federal constitutional claim. See *State* v. *Smith*, 289 Conn. 598, 614 n.21, 960 A.2d 993 (2008); *State* v. *Joyce*, 243 Conn. 282, 288 n.6, 705 A.2d 181 (1997), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523, 140 L. Ed. 2d 674 (1998).

appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest. . . . Therefore, [a]n investigative stop can be appropriate even where the police have not observed a violation because a reasonable and articulable suspicion can arise from conduct that alone is not criminal. . . . In evaluating the validity of such a stop, courts must consider whether, in light of the totality of the circumstances, the police officer had a particularized and objective basis for suspecting the particular person stopped of criminal activity." (Citations omitted; internal quotation marks omitted.) *State* v. *Lipscomb*, 258 Conn. 68, 75–76, 779 A.2d 88 (2001).

"When considering the validity of [an investigatory] stop, our threshold inquiry is twofold. . . . First, we must determine at what point, if any, did the encounter between [the police officer] and the defendant constitute an investigatory stop or seizure. . . . Next, [i]f we conclude that there was such a seizure, we must then determine whether [the police officer] possessed a reasonable and articulable suspicion at the time the seizure occurred." (Citation omitted; internal quotation marks omitted.) *State* v. *Santos*, 267 Conn. 495, 503, 838 A.2d 981 (2004).

The defendant argues that before the police spoke with the pedestrian, the facts known by the police did not support a reasonable and articulable suspicion of criminal activity. In this regard, the defendant emphasizes that the police observed activity that was not criminal in nature; the police did not observe any exchange of money or drugs. The defendant next argues that the officers' brief conversation with the pedestrian, viewed in isolation, did not yield facts that supported a reasonable and articulable suspicion of criminal activity. In this regard, the defendant argues that despite

the officers' favorable assessment of the pedestrian's credibility, there was no showing that the pedestrian was reliable such that the police could justify an investigative detention on the basis of the information she provided. The defendant emphasizes that the pedestrian was not a known informant with a record of providing information to the police. Moreover, the very identity of the pedestrian was unknown to the police; she was not in police custody and took steps to maintain her anonymity. The defendant argues that a finder of fact could not reasonably infer that the pedestrian had any interest in assisting the police by providing accurate information because she did not contact the police; rather, they contacted her while she was walking along the street. The defendant argues that the police did not investigate why the pedestrian concealed her identity, what she was doing in the area at that hour of the day and whether she had any motive to lie to the police. The defendant argues that under these circumstances, the pedestrian had the ability to " 'lie with impunity.' " In light of what little information the police knew about the pedestrian, the defendant argues, the police could not, absent any further investigation, properly rely on the information she provided.

To the extent that the defendant invites us to compartmentalize the facts known by the police, viewing them in terms of facts known before and after the police spoke with the pedestrian, we decline such a method of review. In determining whether the police had a reasonable and articulable suspicion of criminal activity, we look at all of the information known by the police prior to the investigative detention. "Whether a reasonable and articulable suspicion exists depends on the totality of the circumstances." *State* v. *Torelli*, 103 Conn. App. 646, 652, 931 A.2d 337 (2007).

Here, there were many factors that constituted the totality of the circumstances known to the police. First

and foremost, the police knew that this was an area known for drug activity and arrests, and that it was common for those involved in the drug activity to engage in conduct similar to that exhibited by the defendant and the other occupants of the automobile. "Although presence in a high crime area alone cannot constitute a reasonable suspicion [of criminal activity], an officer is not required to ignore the circumstances and area around the observed suspect." *State* v. *Ward,* 83 Conn. App. 377, 383, 849 A.2d 860, cert. denied, 271 Conn. 902, 859 A.2d 566 (2004). Although human experience teaches that it is neither unusual nor suspicious for three men to sit together in a parked automobile, that same experience teaches that such conduct is somewhat unusual and suspicious at 1:30 a.m. on a weekday in February, particularly in an area known for drug trafficking. Thus, the conduct exhibited by the individuals in the automobile reasonably aroused the suspicions of the officers.

Additionally, the Vermont license plates on the automobile reasonably heightened the suspicions of the officers. In evaluating whether a reasonable and articulable suspicion of criminal conduct exists, we must consider all of the relevant facts known to the police. The police knew that the Vermont license plates were out of place in the neighborhood. Additionally, the out-of-state plates made it more likely that the automobile was rented, and the police knew from their training and experience that persons involved in the drug trade typically used rented automobiles to evade police detection. These facts were additional and significant factors in evaluating the suspicions of the police.

After observing the automobile for several minutes, the officers noticed the pedestrian walking along the street. They observed her brief encounter with one or more occupants of the automobile after one of the occupants called her to the automobile. This activity was

consistent with criminal conduct. As noted previously, the police were aware, from their training and experience, that drugs are typically bought or sold in this manner. In light of their prior observations and the inferences to be drawn therefrom, the fact that this brief encounter took place was yet another relevant factor in evaluating the suspicions of the police.

After the defendant drove off, the police had a face-to-face conversation with the pedestrian about what had transpired. That type of conversation afforded the officers an opportunity to gauge the pedestrian's credibility and demeanor. See *State* v. *Gaston*, 82 Conn. App. 161, 167, 842 A.2d 1171 (2004). The officers deemed her to be forthcoming and her version of events, plainly related to the sale of drugs, to be credible.

The police had reason to suspect that this version of events was true because, apart from the information that the pedestrian provided, the police had observed the conduct of the individuals in the automobile, as well as the pedestrian's interaction with one or more of these individuals. There was no evidence that the police told the pedestrian that they had witnessed the entire encounter at issue or that the occupants of the automobile were suspected of committing any crime. That the pedestrian related a version of events that was consistent with what the police had observed, therefore, bolstered by their belief that she had related accurate and reliable information. See *State* v. *Johnson*, 286 Conn. 427, 439–40, 944 A.2d 297 (noting that police corroboration of even innocuous details of informant's information is one factor in establishing reliability of informant), cert. denied, 555 U.S. 883, 129 S. Ct. 236, 172 L. Ed. 2d 144 (2008); *State* v. *Velez*, 215 Conn. 667, 674, 577 A.2d 1043 (1990) (noting that police corroboration of some information provided by informant is one factor in establishing reliability of informant). The reliability of her information also was bolstered by the fact

that the police were aware that she was relating a first-hand encounter and, thus, knew her basis of knowledge. See *State* v. *Smith*, 257 Conn. 216, 225, 777 A.2d 182 (2001). Additionally, the conversation between the police and the pedestrian occurred just moments after the event in question. As experience teaches that the passage of time tends to affect negatively one's ability to recall events, this fact made it less likely that the pedestrian had forgotten the events in question.

The defendant makes much of the fact that the pedestrian did not want to provide any personal information to the police. The defendant also deems it material and significant that the police were unaware of why she did not want to provide such information, that the police knew nothing about her activities that night or that the police were unaware if she had a motive to lie. We agree that ascertaining this additional information certainly might have bolstered the pedestrian's reliability as a police witness. This is not a situation, however, in which the police conducted an investigative detention solely on the basis of an anonymous tip. Although the police did not know much about the pedestrian, they conversed with her face to face and had information from their independent investigation that corroborated her version of events. They knew that she had spoken with one or more persons in the automobile for a brief period of time because they had witnessed that occurrence take place. Although the police could not be certain that the pedestrian lacked a motive to lie, there is nothing in the evidence to suggest that she had such a motive or that when she spoke with the police, at their behest, she knew that regardless of what she told the police, she would be free to go on her way. Accordingly, we reject the defendant's argument that the police could not rely to some degree on the information provided by the pedestrian. We conclude that the police, in their

evaluation of the totality of the circumstances, properly relied on the information that the pedestrian provided.[7]

We have reviewed the facts known by the police prior to the investigative detention. These facts, considered as a whole and along with the rational inferences that could be drawn therefrom, led to a reasonable and articulable suspicion that one or more occupants of the automobile was selling drugs. "The inquiry into reasonable and articulable suspicion does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain commonsense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. . . . [T]he evidence thus collected must be seen

---

[7] Judge Berdon, in his dissenting opinion, faults the majority for concluding that the police officers reasonably relied on the information provided by the pedestrian in their evaluation of the totality of the circumstances. We already have discussed all of the articulable facts known by the police officers prior to their discussion with the pedestrian, as well as the facts relevant to that encounter. We are also mindful that the police officers who spoke with the pedestrian were found to have testified credibly that on the basis of their experience, the pedestrian was forthcoming with regard to what had transpired. These facts lead us to conclude that the police properly relied on the information provided by the pedestrian to the degree that they did in evaluating the totality of the circumstances.

Parting company with the majority's independent evaluation of the pedestrian's reliability, Judge Berdon states that it is "more reasonable and logical" to conclude that the pedestrian was a prostitute who lied to the police. Our Supreme Court has stated: "Courts have properly distinguished between . . . confidential informants and the average citizen who, as a victim or a witness, happens to have information useful to the police. Such citizen informers are considered *more deserving of credibility* than are underworld informers, and courts have accordingly tended to examine the basis and sufficiency of a citizen informer's information more closely than his credibility." (Emphasis added; internal quotation marks omitted.) *State* v. *Barton*, 219 Conn. 529, 542 n.10, 594 A.2d 917 (1991). We have considered the evidence that the pedestrian declined to give her name to the police and that she was walking alone, at a late hour, in an area known for illegal activity. Nonetheless, we respectfully distance ourselves from Judge Berdon's readiness to conclude that this individual who provided information to the police was a criminal engaged in prostitution.

and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." (Internal quotation marks omitted.) *Tarro* v. *Commissioner of Motor Vehicles*, 279 Conn. 280, 292 n.17, 901 A.2d 1186 (2006).

Finally, to the extent that the defendant deems it significant that the police did not observe any type of drug transaction take place and that there were plausible noncriminal justifications for the conduct that the police observed, such arguments are not persuasive. "The fact that an innocuous explanation for the conduct observed may have existed is of no consequence to our analysis when . . . there was a reasonable basis for the police to suspect criminal activity. Suspicious activity, by its very nature, is equivocal and ambiguous. . . . The possibility of an innocent explanation does not deprive the officers of the capacity to entertain a reasonable suspicion of criminal conduct." (Citation omitted; internal quotation marks omitted.) *State* v. *Days*, 89 Conn. App. 789, 802, 875 A.2d 59, cert. denied, 275 Conn. 909, 882 A.2d 677 (2005).

Having concluded that the investigatory detention was supported by a reasonable and articulable suspicion of criminal conduct, we conclude that it did not violate the defendant's constitutional rights. Accordingly, we conclude that the court properly denied the defendant's motion to suppress.

The judgment is affirmed.

In this opinion BEACH, J., concurred.

BERDON, J., dissenting. I disagree with the majority opinion. In my opinion, police Officers Orlando Rosado and David Riehl of the Bridgeport police department

violated the federal constitutional rights[1] of the defendant, Jarrell Richards, when they ordered the defendant's vehicle to be stopped,[2] because they lacked a reasonable and articulable suspicion that the defendant or the other occupants of his vehicle were engaged in criminal activity. In other words, "[a]n investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be engaged in criminal activity." *United States* v. *Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981).

"Our review of the defendant's claim is governed by well established principles. Under the exclusionary rule, evidence must be suppressed if it is found to be the fruit of prior police illegality. . . . On appeal, we apply a familiar standard of review to a trial court's findings and conclusions in connection with a motion to suppress. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . . Whether the trial court properly found that the facts submitted were enough to support a finding of probable cause is a question of law. . . . The trial court's determination on the issue, therefore, is subject to plenary review on appeal. . . . Because a trial court's determination of the validity of a . . . search [or seizure] implicates a defendant's constitutional rights, however, we engage

---

[1] Although the defendant also raises in his brief the issue under our state constitution, which at times our courts have determined affords greater rights than the federal constitution; *State* v. *Oquendo*, 223 Conn. 635, 649–50, 613 A.2d 1300 (1992); at oral argument he agreed that he was not pursuing his claim under the state constitution.

[2] Activities or movements by the occupants in the automobile that may have occurred subsequent to the stop are irrelevant to determining whether the initial stop was constitutional.

in a careful examination of the record to ensure that the court's decision was supported by substantial evidence. . . . However, [w]e [will] give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Citations omitted; internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 42–43, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

In *State* v. *Santos*, 267 Conn. 495, 509, 838 A.2d 981 (2004), our Supreme Court concluded that "the defendant's presence in a high crime area at night, without any other facts, cannot form the basis for a reasonable and articulable suspicion that the defendant had engaged or was about to engage in criminal activity." Certainly, the police had no reason to stop the defendant's automobile on the ground that it had Vermont license plates, was parked at 1:30 a.m. in a high crime area known for its narcotics and prostitution activities and that there were three men (including the defendant) in the vehicle. Even Rosado conceded that these facts provided an insufficient basis for an investigatory stop.[3]

There had to be something more. The something more that the majority depends on and that the court found is the "mystery woman."

The court found credible a mystery woman who was walking on the street at 1:30 a.m. in this high crime area known not only for its narcotics activities but also for prostitution. The mystery woman approached the defendant's vehicle on her own volition[4] shortly before

---

[3] Question by defense counsel: "So, basically, when the [defendant's] car pulled away, you had absolutely no reason to stop that car; did you?" Answer by Rosado: "No." Additionally, although Riehl claimed that the defendant did not have a seat belt on, the court made no such finding, and, regardless, Officer Carl Bergquist did not stop the defendant's vehicle on that basis.

[4] There was no finding that "[o]ne of the officers observed someone in the automobile motion to the . . . [mystery woman] inviting her to approach the automobile"; rather, the court found that "she approached the vehicle."

it drove off. It was not until after the officers approached the mystery woman that she stated (in slang language) that one or more of the men in the defendant's vehicle offered to sell her narcotics. It is more reasonable and logical to conclude, however, that the mystery woman, whose name is unknown because she refused to give it to police, was probably offering her services to the men in the defendant's vehicle, rather than to conclude that the men were attempting to sell her narcotics when she approached the vehicle. This must be viewed in the context that this mystery woman was walking in an area known for its prostitution at 1:30 in the morning and, as found by the court, that she approached the vehicle. One would not expect her to confess to the police that she was soliciting business but, rather, to give some other excuse.

It is well established that the level of scrutiny that a reviewing court must employ when evaluating the credibility of an anonymous witness depends on the nature of the witness. See *State* v. *Barton*, 219 Conn. 529, 542, 594 A.2d 917 (1991). Courts have properly distinguished between a "confidential informant," the term usually used in a more restricted sense "to describe a person who is himself in the underworld," and a "citizen informer," the term used to describe an "average citizen who, as a victim or a witness, happens to have information useful to the police. Such 'citizen informers' are considered more deserving of credibility than are underworld informers, and courts have accordingly tended to examine the basis and sufficiency of a citizen informer's information more closely than his credibility." Id., 542 n.10. On the other hand, "confidential informants are . . . often criminals, drug addicts, or even pathological liars . . . ." (Internal quotation marks omitted.) Id., 542. For a court to assess the reliability of information obtained from a confidential informant, it must consider how the informant gained the

information and why the police officer believes that the information is reliable. Then, the court independently must decide whether the police officer's inferences from the informant's statements are reasonable. Id., 542–43.

I would conclude that the mystery woman in this case is more like a confidential informant than a citizen informer and, further, that the police did not demonstrate that she was credible. She did not approach the police voluntarily, and she was walking the streets in the early hours of the morning in a high crime area known for narcotics and prostitution activities. Additionally, the police had no information that would verify the alleged information from the mystery woman. They never obtained her name, and they never had past dealings with her to verify that she was credible and dependable. There was no evidence about her demeanor or any evidence describing her facial expressions or any other matter to form a basis of her veracity. "[A]n anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity . . . ." *Alabama* v. *White*, 496 U.S. 325, 329, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990).

At the very best, for the state, this is a close case. "In a close case . . . the balance ought to be struck on the side of the freedom of the citizen from governmental intrusion. To conclude otherwise would be to elevate society's interest in apprehending offenders above the right of citizens to be free from unreasonable stops." *State* v. *Oquendo*, 223 Conn. 635, 657, 613 A.2d 1300 (1992).

I would reverse the judgment of the trial court and remand the case with direction to vacate the conditional guilty plea and to dismiss the case.

Accordingly, I respectfully dissent.