## STATE OF CONNECTICUT *v.* TERRELL STATON
## (AC 29607)

DiPentima, Alvord and Hennessy, Js.*

---

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued February 4—officially released April 20, 2010

*Glenn W. Falk,* special public defender, with whom was *Jennifer Rae Taylor,* law student intern, for the appellant (defendant).

*Michele C. Lukban,* senior assistant state's attorney, with whom, on the brief, was *Stephen J. Sedensky III,* state's attorney, for the appellee (state).

*Opinion*

HENNESSY, J. The defendant, Terrell Staton, appeals from the judgment of conviction, rendered after a jury trial, of sale of narcotics by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b), sale of narcotics in violation of General Statutes § 21a-277 (a), sale of narcotics within 1500 feet of a school in violation of General Statutes § 21a-278a (b), possession of narcotics in violation of General Statutes § 21a-279 (a) and possession of narcotics within 1500 feet of a school in violation of General Statutes § 21a-279 (d). On appeal, the defendant claims that the trial court improperly denied his motion to suppress the evidence obtained following his detention because the police lacked a sufficient reasonable suspicion of criminal conduct to stop him. Additionally, the defendant claims that his subsequent detention by the police was unconstitutionally prolonged. We affirm the judgment of the trial court.

The record reveals the following facts and procedural history. Lieutenant Shaun McColgan, a Danbury police officer with over twenty three years experience as an

officer in New York City and Connecticut, and with over 500 drug arrests, went on patrol in an unmarked police station wagon after 3 a.m. on the morning of November 9, 2006. He was aware that the police had been watching a brown car with Colorado license plates earlier that morning and that he was to be on the lookout for suspicious activity associated with that vehicle. Thus, when he saw a brown Chrysler with Colorado license plates, occupied by a driver and a passenger, turn left down Davis Street, McColgan followed.

The Chrysler proceeded slowly down Davis Street, past the Morris Street School, onto Rogers Avenue and then right onto Westville Avenue. After McColgan turned left onto Westville Avenue to avoid detection, he observed the Chrysler turn around in a driveway and then head back up Rogers Avenue before ultimately stopping in front of the Morris Street School. At this point, given that the Chrysler was a known suspicious vehicle driving slowly in the early morning hours and because he believed the vehicle was "casing" the neighborhood, he turned off his vehicle's headlights, backtracked up Rogers Avenue and stopped approximately 200 feet behind the Chrysler on Davis Street. He had an unobstructed view of the Chrysler, and no other vehicles were parked on the road at that time.

McColgan initially thought he saw someone exit the Chrysler and that a burglary of the school was going to occur. Within seconds, however, he realized that the defendant, wearing a black hooded sweatshirt, had approached the Chrysler's front passenger window, leaned into the car and placed his hands on the door. McColgan could not see what was happening inside the vehicle and did not observe the exchange of drugs or money. About ten seconds later, the defendant walked away from the car and into a school parking lot. McColgan testified that, in light of his experience, he suspected a hand-to-hand drug transaction had occurred.

Immediately after the defendant walked away from the vehicle, the Chrysler proceeded north on Davis Street. McColgan turned his vehicle's headlights on and began to follow the Chrysler. As he drove slowly past the defendant, the defendant looked directly at McColgan, who had a clear view of the defendant's face.

McColgan next radioed for assistance, requesting that nearby officers detain the defendant and follow the Chrysler. He gave a very general description of the defendant as a black male and provided his location for the officers. Within one minute, two officers detained the defendant and notified McColgan, who was still following the Chrysler, of the detention. The defendant provided identification to the officers and told them that he was coming from his girlfriend's house and heading to his mother's house. The officers did not handcuff him, they did not place him in a police car, and they did not display their weapons. The defendant, however, was not free to leave.

Concurrent with the investigatory stop of the defendant, two additional undercover officers—who had responded to McColgan's call and closely were following the Chrysler—saw the Chrysler commit a traffic infraction. The officers notified McColgan of the traffic infraction, and he instructed them to make a motor vehicle stop. McColgan then caught up to the Chrysler, which the officers had stopped, received permission from the driver to search the vehicle and found crack cocaine on the passenger side floor. The driver told him that the passenger in the Chrysler had just purchased the drugs from a black male at the Morris Street School.

As a result, McColgan radioed the officers who were detaining the defendant and instructed them to arrest him. McColgan then went to Tomlinson Avenue, where the defendant had been detained, and identified the

defendant as the black male he had seen at the Chrysler's passenger window in front of the Morris Street School. The defendant was brought to the police station and subsequently searched. A cellular telephone, two $50 bills in one pocket and a total of $30 cash in another pocket were found. Approximately twelve to fifteen minutes elapsed from the initial detention of the defendant until he was arrested on Tomlinson Avenue.

On August 10, 2007, the defendant filed a motion to suppress all evidence that the police had obtained as a direct consequence of the investigative stop, including the drugs seized in the Chrysler, the money and the cellular telephone. The court held an evidentiary hearing on the matter on August 14 and 16, 2007. In an oral ruling, the court denied the defendant's motion to suppress.[1] The court stated that a "police officer may, in appropriate circumstances . . . and in an appropriate manner, detain . . . an individual for investigative purposes, even though there is no probable cause to make an arrest. The state has the burden of showing that when the initial seizure of the defendant occurred, the police had sufficient objective indicia of criminal activity [given the totality of the circumstances] to justify an intrusion on the defendant's freedom of movement." According to the court, a reasonable and articulable suspicion could not be based on a mere hunch but, rather, had to be based on specific reasonable inferences that the officer could draw from the facts in light of his experience.

Given this legal standard and the facts of the case, the court concluded that the officers had a reasonable and articulable suspicion to detain the defendant. Among the factors the court considered was McColgan's twenty plus years of experience as a police officer.

---

[1] The court subsequently signed a transcript of its ruling, thereby bringing its decision into compliance with Practice Book § 64-1.

Specifically, the court pointed out that McColgan worked for years in a New York City police department street narcotics unit where he had observed drug transactions involving motor vehicles. Additionally, the court noted the following reasonable inferences: there were no other pedestrians in the area when the defendant was detained, and he was in a residential area at a quiet time of day—approximately 3:30 a.m.

The court then went on to conclude that the approximately twelve to fifteen minute detention of the defendant was not too intrusive or too lengthy to violate his constitutional rights. The court stated that "[t]he purpose of detaining the defendant was to conduct an investigation. [After completing the investigation] the police had probable cause to arrest the defendant for sale of narcotics, when the police obtained the information, which rose to probable cause, the defendant's detention [then] turned into an arrest when . . . McColgan radioed the officers near [the school] that the defendant should [be placed under arrest]." As a result, the court denied the defendant's motion to suppress.

Following a jury trial, the defendant was found guilty of all the drug related charges and not guilty of loitering in or about school grounds. He was sentenced to twenty years in prison, execution suspended after twelve years, and five years of probation.[2] This appeal followed.

We first set forth our standard of review. "[O]ur standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of

_____

[2] The defendant entered guilty pleas to the state's part B information, in which the state alleged that he previously had been twice convicted of the offense of possession of narcotics.

the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the court's [ruling] . . . . Because a trial court's determination of the validity of a . . . search [or seizure] implicates a defendant's constitutional rights . . . we engage in a careful examination of the record to ensure that the court's decision was supported by substantial evidence. . . . However, [w]e [will] give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Citation omitted; internal quotation marks omitted.) *State* v. *Kimble*, 106 Conn. App. 572, 579, 942 A.2d 527, cert. denied, 287 Conn. 912, 950 A.2d 1289 (2008).

I

The defendant claims that the court improperly denied his motion to suppress the evidence obtained following his detention because the police lacked a sufficient reasonable suspicion of a drug transaction to stop him. We disagree.

"The law regarding investigative detentions is well settled in federal and state jurisprudence. Article first, §§ 7 and 9 of our state constitution permit a police officer in appropriate circumstances and in an appropriate manner to detain an individual for investigative purposes even though there is no probable cause to make an arrest. . . . In determining whether the detention was justified in a given case, a court must consider if [b]ased upon the whole picture the detaining officers [had] a particularized and objective basis for suspecting the particular person stopped of criminal activity. . . . A court reviewing the legality of a stop must therefore examine the specific information available to the police officer at the time of the initial intrusion and any rational

inferences to be derived therefrom. . . . These standards, which mirror those set forth by the United States Supreme Court in *Terry* v. *Ohio*, [392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)], with regard to fourth amendment analysis, govern the legality of investigatory detentions under article first, §§ 7 and 9 of our state constitution."[3] (Internal quotation marks omitted.) *State* v. *Kimble*, supra, 106 Conn. App. 596–97.

"[I]n justifying [a] particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. . . . In determining whether a detention is justified in a given case, a court must consider if, relying on the whole picture, the detaining officers had a particularized and objective basis for suspecting the particular person stopped of criminal activity. When reviewing the legality of a stop, a court must examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom. . . . A recognized function of a constitutionally permissible stop is to maintain the status quo for a brief period of time to enable the police to investigate a suspected crime. . . .

"[E]ffective crime prevention and detection . . . [underlie] the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating

---

[3] In his brief, the defendant correctly states that article first, §§ 7 and 9, of the constitution of Connecticut afford greater protection to the citizens of this state than the federal constitution in determining what constitutes a seizure. See *State* v. *Oquendo*, 223 Conn. 635, 649–50, 613 A.2d 1300 (1992). The defendant also acknowledges in his brief, however, that there is no dispute in this case that he was subject to a seizure. Consequently, because the constitutional principles that govern what constitutes reasonable and articulable suspicion are the same under both the state and federal constitutions, we need not separately analyze this claim under each constitution. See *State* v. *Richards*, 113 Conn. App. 823, 832 n.6, 968 A.2d 920, cert. granted on other grounds, 292 Conn. 905, 973 A.2d 107 (2009).

possibly criminal behavior even though there is no probable cause to make an arrest. . . . Therefore, [a]n investigative stop can be appropriate even where the police have not observed a violation because a reasonable and articulable suspicion can arise from conduct that alone is not criminal. . . . In evaluating the validity of such a stop, courts must consider whether, in light of the totality of the circumstances, the police officer had a particularized and objective basis for suspecting the particular person stopped of criminal activity." (Citations omitted; internal quotation marks omitted.) *State* v. *Lipscomb*, 258 Conn. 68, 75–76, 779 A.2d 88 (2001).

Accordingly, "[t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." (Internal quotation marks omitted.) *State* v. *Ward*, 83 Conn. App. 377, 388, 849 A.2d 860, cert. denied, 271 Conn. 902, 859 A.2d 566 (2004).

"When considering the validity of [an investigatory] stop, our threshold inquiry is twofold. . . . First, we must determine at what point, if any, did the encounter between [the police officer] and the defendant constitute an investigatory stop or seizure. . . . Next, [i]f we conclude that there was such a seizure, we must then determine whether [the police officer] possessed a reasonable and articulable suspicion at the time the seizure occurred." (Citations omitted; internal quotation marks omitted.) *State* v. *Santos*, 267 Conn. 495, 503, 838 A.2d

981 (2004). Because there is no dispute in this case regarding the court's determination that the defendant was subject to an investigatory stop or seizure, we move directly to the reasonable and articulable suspicion analysis.

On appeal, the defendant does not challenge the court's findings of fact.[4] The defendant claims that his rights under the fourth amendment to the United States constitution,[5] and under article first, §§ 7[6] and 9,[7] of the Connecticut constitution, were violated because there was no objective, particularized suspicion that he was involved in criminal activity at the time the police stopped him. According to the defendant, he could have been giving directions to the out-of-state car on the morning in question, and, additionally, it was significant that the police did not observe an exchange of money or drugs. The defendant argues that the police had, at most, an unparticularized suspicion or hunch that he was engaged in criminal activity, and, therefore, all the evidence that the police obtained as a direct consequence of the investigative stop should be suppressed. We are not persuaded.

Our review of the record indicates that the court, consistent with the reasonable suspicion standard

[4] Although the defendant contests whether he was detained in a high crime area, the court did not make a finding on this issue. Because we conclude that the uncontested facts sufficiently support the court's denial of the defendant's motion to suppress, we need not address this unresolved factor on appeal.

[5] The fourth amendment to the United States constitution provides in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

[6] Article first, § 7, of the constitution of Connecticut provides in relevant part: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures . . . ."

[7] Article first, § 9, of the constitution of Connecticut provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

established by our jurisprudence, properly concluded that the officers had a reasonable basis for their investigative stop. This conclusion is supported by the testimony presented at the suppression hearing and the court's findings. The police were on the lookout for suspicious activity associated with a brown car with Colorado license plates. When McColgan saw a brown Chrysler with Colorado license plates after 3 a.m., he began to follow the vehicle. The Chrysler was proceeding slowly, then turned around in a driveway, immediately retraced its route and stopped at a school it had just passed, as if it were "casing" the neighborhood. At this time, McColgan already was suspicious of potential illegal activity. After the Chrysler stopped in front of the school, the defendant suddenly appeared, leaned into the vehicle and ten seconds later walked away. The court pointed out that there were no other pedestrians in the area, it was a residential neighborhood, and it was a quiet time of day.

The court specifically cited to McColgan's twenty plus years of police experience, both in New York City, where he worked on a street narcotics unit observing drug sale transactions involving motor vehicles, and in Danbury, as a relevant factor in determining whether he possessed a reasonable and articulable suspicion to detain the defendant. Our Supreme Court has stated that part of the totality of circumstances that a court considers "are those inferences and deductions made by officers under the particular circumstances, since law enforcement officials are trained to cull significance from behavior that would appear innocent to the untrained observer." (Internal quotation marks omitted.) *State* v. *Nash*, 278 Conn. 620, 635, 899 A.2d 1 (2006); see *State* v. *Tuck*, 90 Conn. App. 872, 879 n.1, 879 A.2d 553 (2005).

Furthermore, in determining whether police have reasonable suspicion to stop a vehicle, the United States

Supreme Court has stated that reviewing courts "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing. . . . This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." (Citation omitted; internal quotation marks omitted.) *United States* v. *Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002). This is precisely what McColgan did in this case. He testified that, in light of his experience, he suspected a hand-to-hand drug transaction had occurred.

Finally, to the extent that the defendant deems it significant that the police did not see the actual exchange of money and drugs and that there were plausible noncriminal justifications for the conduct that the police did observe, such arguments are not persuasive. "The fact that an innocuous explanation for the conduct observed may have existed is of no consequence to our analysis when . . . there was a reasonable basis for the police to suspect criminal activity. Suspicious activity, by its very nature, is equivocal and ambiguous. . . . The possibility of an innocent explanation does not deprive the officers of the capacity to entertain a reasonable suspicion of criminal conduct." (Citation omitted; internal quotation marks omitted.) *State* v. *Days*, 89 Conn. App. 789, 802, 875 A.2d 59, cert. denied, 275 Conn. 909, 882 A.2d 677 (2005).

The foregoing circumstances yielded sufficient specific and articulable facts to render the investigatory stop of the defendant constitutionally reasonable. On the basis of the totality of the circumstances, which includes McColgan's vast police experience and the rational inferences he derived from the information available to him, it is clear that he had a particularized

and objective basis for suspecting that the defendant was involved in criminal activity. We conclude that the court properly found that the facts justified the initial stop of the defendant.[8]

## II

Having determined that the investigative stop was "justified at its inception"; *Terry* v. *Ohio*, supra, 392 U.S. 20; we next must consider "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Id. The defendant claims that the officers' minimal level of suspicion, even if it was enough for an investigative stop pursuant to *Terry*, did not justify the prolonged detention of him after he provided identification and answered questions regarding where he was coming from and where he was going. He argues that McColgan's direction to the officers to detain him indefinitely, while McColgan pursued the Chrysler, violated both his federal and state constitutional rights. Because his behavior did not confirm or arouse the existing level of suspicion, the defendant argues, the officers should have released him immediately. We disagree.

The limit of an investigative stop is grounded in the standard of reasonableness embodied in the fourth amendment. The test "balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion. . . . Determination of the means and duration that are reasonably necessary for an investigative stop depends on a fact-bound examination of the

---

[8] Although the defendant relies on *State* v. *Donahue*, 251 Conn. 636, 742 A.2d 775 (1999), cert. denied, 531 U.S. 924, 121 S. Ct. 299, 148 L. Ed. 2d 240 (2000), and *State* v. *Oquendo*, 223 Conn. 635, 613 A.2d 1300 (1992), the circumstances justifying the investigative stop in this case exceed those circumstances that our Supreme Court rejected in *Donahue* and *Oquendo*. See *State* v. *Lipscomb*, supra, 258 Conn. 77–78, for a relevant discussion of the minimal circumstances present in those two cases.

particular circumstances." (Citations omitted; internal quotation marks omitted.) *State* v. *Foster*, 13 Conn. App. 214, 218, 535 A.2d 393 (1988). "In assessing whether a detention is too long in duration to be justified as investigative, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was only to confirm or dispel their suspicion quickly, during which time it was necessary to detain the defendant." (Internal quotation marks omitted.) *State* v. *Ward*, supra, 83 Conn. App. 389.

We find nothing in this record to persuade us that the approximately twelve to fifteen minute investigatory stop of the defendant was illegal. Within one minute after the defendant left the Chrysler, he was detained by officers on Tomlinson Avenue. While the officers detained the defendant, McColgan was following the Chrysler. After additional officers stopped the Chrysler for a traffic infraction, the driver gave McColgan permission to search the car. Immediately after crack cocaine was found in the car, McColgan radioed the officers who were detaining the defendant and instructed them to arrest him. McColgan then went to Tomlinson Avenue and identified the defendant as the black male he had seen at the Chrysler's passenger window in front of the Morris Street School.

McColgan's diligent conduct strictly was tied to, and justified by, the circumstances that gave rise to his reasonable and articulable suspicion that the defendant was involved in a drug transaction. Thus, the detention of the defendant for approximately twelve to fifteen minutes reasonably was calculated to maintain the status quo for a brief period of time to enable the police to investigate a suspected crime. See id., 388.

Because the investigatory detention was supported by a reasonable and articulable suspicion of criminal conduct and the duration of the stop was appropriate

under the circumstances, we conclude that the defendant's constitutional rights were not violated. Accordingly, the court properly denied the defendant's motion to suppress.

The judgment is affirmed.

In this opinion the other judges concurred.

---

* The listing of judges reflects their seniority status on this court as of the date of oral argument.