STATE OF CONNECTICUT *v.* JOHN MCCORMACK
(AC 31584)

DiPentima, C. J., and Beach and Bear, Js.

Argued September 22—officially released December 13, 2011

*Alan Jay Black*, for the appellant (defendant).

*Samuel S. Saltman*, certified legal intern, with whom were *Harry Weller*, senior assistant state's attorney, and, on the brief, *Michael L. Regan*, state's attorney, and *Thomas M. DeLillo*, assistant state's attorney, for the appellee (state).

*Opinion*

BEAR, J. The defendant, John McCormack, appeals from the judgments of conviction, rendered after he entered conditional pleas of nolo contendere to the offenses of larceny in the first degree in violation of General Statutes § 53a-122, burglary in the third degree in violation of General Statutes § 53a-103 and stealing a firearm in violation of General Statutes § 53a-212.

On appeal, the defendant claims that the trial court improperly denied his motion to suppress certain evidence. We disagree, and, accordingly, affirm the judgments of conviction.

In its September 8, 2008 memorandum of decision denying the defendant's motion to suppress, the trial court set forth the following facts.[1] "During the early months of 2007, a rash of residential burglaries occurred in the Norwich/Bozrah area near Wawecus Hill Road, Briar Hill Road (Norwich) and South Road (Bozrah). One such burglary occurred in the early afternoon on February 14, 2007, at 12 Wawecus Hill Road at a home owned by [Leon] and [Rena] Barnowski. [Rena] Barnowski was preparing to leave her home on a clear, cold day. She saw a person wearing a black or blue colored sweatshirt with hood pulled over the head with dark pants walking in front of her home. The individual was of an unknown race but appeared to have the upper body shape of a man. She left home and returned approximately one hour later finding her home broken into with several items of personal property stolen including her husband's .38 caliber handgun.

"Two days prior to the break-in, [Leon and Rena] Barnowski had seen a similar looking person walking by their home between 12 and 2 p.m. [Leon Barnowski] described him as a suspicious looking person with a dark colored hooded sweatshirt with the hood pulled over his head. He was looking down in a manner that was not consistent with the normal people seen walking on their street in their rural neighborhood. Their view was clear and unobstructed and [at] a distance of 90 to 100 feet.

---

[1] Pursuant to the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution, on July 17, 2008, the defendant moved to suppress the evidence obtained by the police, including the oral and written statements made by the defendant to the police.

"After the break-in on February [14], the Barnowskis supplied information to a trooper from the Connecticut state police of the burglary, [a] description of the individual seen on February [12] and [14] and the items stolen which included cash, a flashlight and the handgun. The trooper in turn disseminated the information to local police departments including the Norwich police.

"During the time period of the Barnowski burglary, other burglaries were occurring in the street areas in question. Trooper [Harold] French, who was investigating those crimes, developed a similar description from another source or witness. [Scott] Carr of 273 Old Salem . . . Road, Bozrah, gave a statement on March 19, 2007, indicating that he observed a person described as a mixed male Hispanic and white wearing snow camo pants, a white jacket with a black hood or sweatshirt underneath with the hood over his face. . . . Carr's home was broken into by an unknown burglar. . . . Carr also described the individual as having his hood on and his face was down. . . . Carr saw the man shortly after his home was broken into in and around the time the Barnowski home was burglarized. That information was also supplied to the Norwich police department by the state police.

"During the lunch hour of March 21, 2007, [Rena] Barnowski saw an individual matching the description of the person she saw walking by her house on February [12] and [14]. She contacted her husband who contacted the Norwich police department. Officers [Joseph] Dolan and [Peter] Camp were dispatched to the area in question. Each officer was aware that the individual matching the description had been seen in the Wawecus Hill Road area during the time that the previous burglaries had occurred and that a handgun had been stolen.

"Both officers observed the defendant walking on Carey Lane in Norwich after directions as to his whereabouts [were] supplied by [Rena] Barnowski. He was wearing a black hooded sweatshirt with the hood pulled over his head. He had his hands in the pockets of his sweatshirt.

"Officer Dolan ordered the defendant to remove his hands from his sweatshirt pocket and the defendant complied. He then advised the defendant that he was not under arrest and that he was detained. The officer then handcuffed the defendant for his and the officer's safety. Officer Dolan then began to pat him down for weapons. Immediately while patting him down, Dolan saw a handgun in his sweatshirt pocket. The defendant told the officer that he was not properly licensed nor legally permitted to carry the gun. The defendant was then advised of his rights and placed under arrest."

The state initially charged the defendant with various criminal violations in multiple dockets.[2] The defendant

[2] The defendant's charges were contained in eight separate dockets. Specifically, the defendant was charged under docket CR-07-100764 with carrying a dangerous weapon in violation of General Statutes § 53-206, possession of burglar's tools in violation of General Statutes § 53a-106, stealing a firearm in violation of General Statutes § 53a-212, failure to carry a pistol permit in violation of General Statutes § 29-35 (b) and larceny in the third degree in violation of General Statutes § 53a-124. The defendant was charged under docket CR-07-101032 with burglary in the third degree in violation of § 53a-103 and criminal mischief in the third degree in violation of General Statutes § 53a-117. The defendant was charged under docket CR-07-101821 with burglary in the third degree, criminal mischief in the third degree and larceny in the sixth degree in violation of General Statutes § 53a-125b. The defendant was charged under docket CR-07-101028 with burglary in the second degree in violation of General Statutes § 53a-102, three counts of larceny in the sixth degree, two counts of fraudulent use of an automated teller machine in violation of General Statutes § 53a-127b, three counts of burglary in the third degree, larceny in the fifth degree in violation of General Statutes § 53a-125a and two counts of criminal mischief in the third degree. The defendant was charged under docket CR-07-101033 with larceny in the first degree in violation of § 53a-122. The defendant was charged under docket CR-07-101822 with burglary in the third degree, criminal mischief in the third degree and larceny in the fifth degree. The defendant was charged

moved to suppress the evidence obtained by the police during the investigatory stop, including his statements to the police, as fruit of an unlawful search and seizure pursuant to the fourth amendment to the United States constitution and article first, § 7, of the constitution of Connecticut. Following an evidentiary hearing, the court denied the defendant's motion to suppress. On the basis of the facts previously set forth, the court concluded that, under the totality of the circumstances, the defendant's detention and search were justified by a reasonable and articulable suspicion. Specifically, the court noted that the police were "sent out to locate an identifiable individual who was seen in the area prior and subsequent to the specific burglaries in the same general locale by at least three individuals." In addition, the court noted that descriptions of the burglary suspect given to police, while not identical, "were significantly similar describing a male with dark clothes, a hooded sweatshirt, looking down with hands in his pockets."

After the court denied his motion to suppress, the defendant entered conditional pleas of nolo contendere to one count each of larceny in the first degree, burglary in the third degree and stealing a firearm.[3] The court accepted the pleas and sentenced the defendant to a total effective term of twelve years incarceration, execution suspended after four years, followed by five years probation.[4] The state entered a nolle prosequi on each of the other open counts. This appeal followed.

under docket CR-07-101031 with burglary in the third degree, larceny in the sixth degree and criminal mischief in the third degree. The defendant was charged under docket CR-07-101034 with burglary in the third degree, larceny in the fifth degree and stealing a firearm.

[3] The defendant pleaded nolo contendere to larceny in the first degree in docket CR-07-101033. The defendant's other pleas were entered in docket CR-07-101034.

[4] General Statutes § 54-94a provides that a defendant may appeal from the denial of a motion to suppress after having entered a conditional plea of nolo contendere so long as the trial court determines that the ruling on the motion to suppress "would be dispositive of the case. . . ." The plea form in the present matter did not indicate whether the court determined

On appeal, the defendant claims that the trial court improperly denied his motion to suppress. The defendant argues that, because there was no articulable suspicion justifying his detention and the subsequent search of his person, the court's erroneous denial of his motion violated his rights under the state and federal constitutions.[5] We are not persuaded.

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed

that the ruling on the defendant's motion to suppress would be dispositive and a review of the plea hearing transcript reveals that the court did not explicitly indicate that its ruling on the motion to suppress would be dispositive. The parties stipulated at oral argument, however, and we agree that the record allows this court reasonably to infer that the trial court determined that denial of the motion to suppress was dispositive because the court accepted the conditional nolo contendere plea in the present matter.

[5] Aside from claiming violations of his constitutional rights under the fourth amendment to the United States constitution, the defendant claims that there is an independent state ground for deciding this matter under article first, §§ 7 and 9, of the constitution of Connecticut. The defendant argues that our state constitution provides greater protection than the federal constitution in determining what conduct constitutes a seizure. Although the defendant is correct in noting that we provide a higher standard of protection when considering whether an individual was seized by police; see, e.g., *State* v. *Oquendo*, 223 Conn. 635, 649–50, 613 A.2d 1300 (1992); the question of whether the defendant was seized is not at issue in the present matter. See footnote 6 of this opinion. Rather, the relevant inquiry on appeal is whether such seizure was supported by a reasonable suspicion. We note that the standards we apply to our determination of whether a police seizure was justified by reasonable suspicion under our state constitution mirror those set forth by the United States Supreme Court with regard to fourth amendment claims. See, e.g., *State* v. *Donahue*, 251 Conn. 636, 644, 742 A.2d 775 (1999), cert. denied, 531 U.S. 924, 121 S. Ct. 299, 148 L. Ed. 2d 240 (2000). Thus, we undertake the same analysis of the defendant's claim under both our federal and state constitutions. *State* v. *Staton*, 120 Conn. App. 497, 505 n.3, 992 A.2d 348 ("because the constitutional principles that govern what constitutes reasonable and articulable suspicion are the same under both the state and federal constitutions, we need not separately analyze this claim under each constitution"), cert. denied, 297 Conn. 911, 995 A.2d 640 (2010); cf. *State* v. *Aviles*, 277 Conn. 281, 286 n.3, 891 A.2d 935, cert. denied, 549 U.S. 840, 127 S. Ct. 108, 166 L. Ed. 2d 69 (2006).

unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . . We undertake a more probing factual review when a constitutional question hangs in the balance." (Citation omitted; internal quotation marks omitted.) *State* v. *Burroughs*, 288 Conn. 836, 843, 955 A.2d 43 (2008).

The standards governing our analysis under article first, §§ 7 and 9, of our state constitution "mirror those set forth by the United States Supreme Court in *Terry* v. *Ohio*, [392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)], with regard to [federal] fourth amendment analysis . . . ." *State* v. *Oquendo*, 223 Conn. 635, 654, 613 A.2d 1300 (1992). "[T]he touchstone of our analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security . . . and that reasonableness depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers . . . . [A] police officer is permitted in appropriate circumstances and in an appropriate manner to detain an individual for investigative purposes if the officer believes, based on a reasonable and articulable suspicion that the individual is engaged in criminal activity, even if there is no probable cause to make an arrest. . . . [T]he officer may briefly stop the suspicious person and make reasonable inquiries aimed at confirming or dispelling his suspicions." (Citations omitted; internal quotation marks omitted.) *State* v. *Kelly*, 129 Conn. App. 109, 117–18, 19 A.3d 223, cert. granted on other grounds, 302 Conn. 920, 28 A.3d 338 (2011).

"Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of

the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. . . . In determining whether a detention is justified in a given case, a court must consider if, relying on the whole picture, the detaining officers had a particularized and objective basis for suspecting the particular person stopped of criminal activity. . . . The threshold for reasonable and articulable suspicion requires less than probable cause . . . . The determination is not a technical one, but is informed by the factual and practical considerations of everyday life. . . . In this respect, the perceptions of an experienced police officer might have more significance to him in determining whether the law is being violated at a given time and place than they would have to a layman . . . ." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 121 Conn. App. 250, 256, 994 A.2d 691, cert. denied, 297 Conn. 918, 996 A.2d 278 (2010).

The defendant argues that his seizure was improper because the police did not have a reasonable and articulable suspicion to justify their actions.[6] The defendant argues that the record contains no indication that he was observed directly engaging in criminal conduct or suspicious activity. Rather, the defendant contends that he simply was walking down a street, dressed appropriately for a brisk March day, in an area where there

___

[6] "Ordinarily, [w]hen considering the validity of a . . . stop, our threshold inquiry is twofold. . . . First, we must determine at what point, if any, did the encounter between [the police officer] and the defendant constitute an investigatory stop or seizure. . . . Next, [i]f we conclude that there was such a seizure, we must then determine whether [the police officer] possessed a reasonable and articulable suspicion at the time the seizure occurred." (Internal quotation marks omitted.) *State* v. *Clark*, 297 Conn. 1, 7–8, 997 A.2d 461 (2010).

The state concedes that the defendant was seized by the police. Therefore, we restrict our analysis to whether the actions of the police were supported by a reasonable and articulable suspicion.

had been a number of recent burglaries; he was never observed exiting a residence, carrying personal property or otherwise engaging in behavior consistent with that of a burglar.

Viewed in isolation, the defendant's presence in the particular neighborhood where he was seized by the police; *State* v. *Oquendo*, supra, 223 Conn. 655 n.11 ("[a] history of past criminal activity in a locality does not justify suspension of the constitutional rights of everyone, or anyone, who may subsequently be in that locality" [internal quotation marks omitted]); the time of day when he was observed walking in that neighborhood; *State* v. *Donahue*, 251 Conn. 636, 645, 742 A.2d 775 (1999) (car parked at particular location at early morning hour not criminal in and of itself), cert. denied, 531 U.S. 924, 121 S. Ct. 299, 148 L. Ed. 2d 240 (2000); his manner of dress; *State* v. *Oquendo*, supra, 655 (manner of dress, although consistent with burglar profile, also consistent with homeless individual); and the peculiarities of his gait may appear innocuous or susceptible to an innocent explanation. Nonetheless, when considered under the totality of the circumstances presented, including the information received from the victims and the investigation of the prior burglaries, we conclude that those same factors provide the basis for a sufficient articulable suspicion to conduct an investigatory stop. Cf. *State* v. *Staton*, 120 Conn. App. 497, 506, 992 A.2d 348 ("[a]n investigative stop can be appropriate even where the police have not observed a violation because a reasonable and articulable suspicion can arise from conduct that alone is not criminal"), cert. denied, 297 Conn. 911, 995 A.2d 640 (2010); see also *State* v. *Mitchell*, 204 Conn. 187, 195–96, 527 A.2d 1168 (victim identification of suspects and vehicle provided basis for reasonable suspicion), cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987); *State* v. *Jennings*, 19 Conn. App. 265, 269, 562 A.2d 545 ("[t]he possibility of an

innocent explanation does not deprive the officers of the capacity to entertain a reasonable suspicion of criminal conduct" [internal quotation marks omitted]), cert. denied, 212 Conn. 815, 565 A.2d 537 (1989).

Here, the court's factual findings and the suppression hearing testimony provide ample support for its conclusion that the stop was justified by a reasonable and articulable suspicion. The defendant was observed in geographic and temporal proximity to a series of recent burglaries. Not only had the burglaries occurred within the month preceding the defendant's seizure, but the latest in the series had occurred only two days prior to Rena Barnowski's March 21, 2007 observation of the defendant whom she previously had seen walking outside her home on February 12 and 14, 2007. Moreover, the defendant was observed in the same residential area where the burglaries had occurred, at the same approximate time of day when those burglaries had occurred. The police were aware of these prior incidents and, in addition, were aware that a gun had been stolen. The police were acting pursuant to an official dispatch describing a suspicious individual, and, furthermore, the defendant matched the physical description of the burglary suspect that the police had developed, in part, through interviews with burglary victims. Although the defendant argues that there were discrepancies among the physical descriptions provided to the police, reasonable suspicion need not be predicated upon perfectly consistent descriptions. *State v. Rodriguez*, 239 Conn. 235, 246–47 n.18, 684 A.2d 1165 (1996) ("[w]hat must be taken into account [when determining the existence of a reasonable and articulable suspicion] is the strength of those points of comparison which do match up and whether the nature of the descriptive factors which do not match is such that an error as to them is not improbable" [internal quotation marks omitted]).

The defendant further argues that the facts of this case are similar to those in *State* v. *Oquendo,* supra, 223 Conn. 635. The defendant contends that his manner of dress on a winter day "is not even close to the level of suspicious conduct noted in *Oquendo,*" and, furthermore, argues that actions of the defendant in *Oquendo*—carrying a duffel bag in a high crime neighborhood at 1 a.m.—"are much more suspicio[us] than the actions in our case." We are not persuaded.

In *Oquendo,* a police officer came upon the defendant and his companion while patrolling a neighborhood where there had been a series of burglaries. *State* v. *Oquendo,* supra, 223 Conn. 640–41. Although it was a warm August evening, the officer observed that the defendant was wearing a heavy winter jacket. Id., 641. The defendant also was carrying a duffel bag. Id. Moreover, the police officer was aware that the defendant's companion previously had been arrested on burglary charges. Id. The officer testified that he had a " 'hunch' " that the defendant and his companion had committed or were about to commit a burglary. Id. After asking the defendant a few questions, the officer instructed him to approach his cruiser with the duffel bag. Id., 641–42. The defendant, in response, ran from the officer and threw the bag near a wooded area. Id., 642. The officer recovered the bag which contained "two plastic bags containing white powder, which subsequently tested positive for cocaine." Id.

The *Oquendo* court held that the investigative stop of the defendant was not constitutionally sound. Id., 655. In reaching that conclusion, the court determined that "[a]lthough burglaries had been reported in the general area of [the police officer's] patrol, [the police officer] had not received any report that a burglary had been committed in that area on [that] evening . . . nor did he possess information linking the defendant or [his companion] to a particular burglary in the area.

Moreover, although [the police officer] testified that the manner of dress of the defendant and [his companion] fit the profile of burglars, he acknowledged that homeless people often dress in a similar manner and carry items with them. The fact that [the defendant's companion] was known to [the police officer] as a recent arrestee for larceny and burglary could not supply [the police officer] with reasonable suspicion about the defendant. In addition, the fact that [the police officer] did not recognize the defendant from his familiarity with 'street people' in Wallingford could not provide justifiable grounds for a stop." Id.

The present matter is distinguishable. Here, there was reliable information provided by some of the victims, Carr and the Barnowskis; see *State* v. *Daley*, 189 Conn. 717, 723–24, 458 A.2d 1147 (1983) (information provided by victim or witness to crime accorded higher degree of reliability than other informants); 2 W. LaFave, Search and Seizure (4th Ed. 2004) § 3.4 (a), p. 226 ("any person purporting to be a crime victim or witness may be presumed reliable, though the police must remain alert to the existence of any circumstances which would make that presumption inoperative in a particular case"); linking an individual matching the defendant's general physical description to the recent burglaries in the area. In addition, the defendant was seized at a time and in a location consistent with the burglary suspect's pattern of behavior, as established through the police investigation. When Dolan and Camp approached the defendant, they were not only relying on his physical similarity to the description developed through the burglary investigation, but also on the Barnowskis' belief that the defendant was the same individual they had witnessed outside their home prior to it being burglarized. These facts readily distinguish the present case from *Oquendo*.

The defendant also argues that the police officers' actions in immediately handcuffing and patting him down were unnecessary. The defendant contends that "the stop by the police officer is bad at its inception; the immediate handcuffing of the defendant was an extreme measure to be taken." We disagree.

"It is well established . . . that [a] police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous. . . . The authority to permit a reasonable search for weapons for the protection of the police officer is narrowly drawn applying only where he has reason to believe that he is dealing with an armed and dangerous individual . . . . The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. . . . And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or hunch, but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." (Internal quotation marks omitted.) *State* v. *Jenkins*, 298 Conn. 209, 234, 3 A.3d 806 (2010).

In the present case, the court found that, upon being dispatched to investigate the presence of a suspect matching the description of the burglary suspect developed by the police, Dolan and Camp were "aware that the individual matching the description had been seen in the Wawecus Hill Road area during the time that the previous burglaries had occurred and that a handgun had been stolen." At the suppression hearing, Camp

testified that when he approached the defendant, "the suspect was walking down, looking at the pavement, with a hood over his head and his hands in his pocket . . . ." Camp further testified he ordered the defendant to remove his hands from his sweatshirt "[t]o make sure that he didn't have a gun in his hand," and that he based his request on his knowledge of the stolen handgun. Under the circumstances presented at the time of the defendant's seizure, the police acted pursuant to a reasonably prudent belief that their safety and the safety of others—including the defendant—was in danger. Accordingly, the patdown of the defendant, while in handcuffs, was reasonable.

"[I]n justifying [a] particular intrusion [a] police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (Internal quotation marks omitted.) *State* v. *Jensen*, 109 Conn. App. 617, 622, 952 A.2d 95 (2008). Under the totality of the circumstances, the police had a reasonable and articulable suspicion justifying the seizure and protective patdown of the defendant. On the basis of his identification by one of the victims, his proximity to the area of a series of recent burglaries, the time of day he was walking in that particular area, his physical similarity to the description developed by the police through citizen informants and reasonable inferences to be drawn therefrom, the police had reasonable suspicion to believe that the defendant had engaged in or was about to engage in criminal activity. Furthermore, on the basis of the facts found, the police had reasonable suspicion to believe that the defendant illegally possessed a firearm. Our review of the record supports the court's determination that the stop and frisk of the defendant was justified by a reasonable and articulable suspicion.

The judgments are affirmed.

In this opinion the other judges concurred.